UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| CHARLES E. COMPTON, | ) | |
| (Social Security No. XXX-XX-7981), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:08-cv-65-WGH-RLY |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM  DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 12, 28) and an Order of Reference entered by District Judge Richard L. Young on March 4, 2009.  (Docket No. 29).

## I.  Statement of the Case

Plaintiff, Charles E. Compton, seeks judicial review of the final decision of the agency, which found him not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. § 404.1520(f).  This court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on November 1, 2004, alleging disability since June 15, 1998.[1] (R. 10, 61-63). The agency denied Plaintiff's application both initially and on reconsideration. (R. 32, 36). Plaintiff appeared and testified at a hearing before Administrative Law Judge William Hafer ("ALJ") on September 12, 2007. (R. 233-53). Plaintiff was represented by an attorney; also testifying was a vocational expert ("VE"). (R. 233). On January 9, 2008, the ALJ issued his opinion finding that Plaintiff was not disabled because he retained the residual functional capacity ("RFC") to perform his past work. (R. 10-16). After Plaintiff filed a request for review, the Appeals Council denied Plaintiff's request, leaving the ALJ's decision as the final decision of the Commissioner. (R. 2-4). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on May 19, 2008, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

### A. Vocational Profile

Plaintiff was 64 years old at the time of the ALJ's decision and had a high school education. (R. 238). His past relevant work experience included work as a car detailer and janitor, both of which were at the medium exertional level. (R. 16).

---

[1]Plaintiff has since amended his alleged onset date to February 2, 2005. (R. 250).

**B.  Medical Evidence**

    **1.  Plaintiff's Physical Impairments**

On April 22, 2000, Lisa Edgerton, M.D., examined Plaintiff at the request of the Social Security Administration.  (R. 176-77).  Plaintiff was 6'2" in height and weighed 240 lbs.  The exam showed occasional wheezes bilaterally and decreased breath sounds; Plaintiff was using an albuterol inhaler.  Plaintiff's extremities were normal with no edema; Dr. Edgerton did find that Plaintiff's left hand was very mildly swollen.  (R. 177).  Plaintiff had a normal gait and station with no use of assistive devices.  (R. 177).  He was unable to walk on his toes, but was able to walk on his heels, and he was able to tandem walk with a little bit of unsteadiness.  Plaintiff was able to squat and rise from a squatted position with assistance from a couple of chairs.  (R. 177).  Dr. Edgerton noted that Plaintiff had decreased range of motion in the dorsal lumbar spine and the left shoulder secondary to pain, as well as decreased range of motion in the hip and knee secondary to pain and obesity.  Straight leg raising was positive on the left side.  (R. 177).  Plaintiff displayed muscle strength that was 5/5 and symmetrical throughout.  (R. 177).  Deep tendon reflexes were 1/4 in all extremities.  Plaintiff had 5/5 grip strength and normal fine motor manipulation.  (R. 177).  Dr. Edgerton's impression was chronic low back pain secondary to degenerative joint disease, hypertension, and tobacco abuse.  She thought he might benefit from physical therapy for his low back pain or epidural injections, and she noted that he needed to quit smoking.  (R. 177).

On May 31, 2000, John A. Bizal, M.D., saw Plaintiff for complaints of hearing loss.  (R. 181).  An examination of Plaintiff's ears, neck, and head was normal.  Plaintiff had mild to moderate hearing loss in both ears that averaged 25 dB.  Dr. Bizal opined that Plaintiff's mild hearing loss would give him occasional social problems but did not require hearing aids.  (R. 181).

Plaintiff's treating physician at ECHO Community Health Care ("ECHO") is Edward Lagunzad, D.O.  When first seen by Dr. Lagunzad on April 23, 2003, Plaintiff complained of arthritis and pain in his feet, knees, and hands.  (R. 205). An exam of Plaintiff revealed no edema in his extremities, and there were no other significant observations made regarding Plaintiff's extremities.  The assessment was that of rheumatoid arthritis, and he was prescribed Vioxx.  (R. 205).

On October 29, 2003, the notes from ECHO reveal that Plaintiff's assessment continued to be arthritis, and the Vioxx prescription was renewed. (R. 200).

When Plaintiff was examined at ECHO on September 28, 2004, it is noted his ankles were swollen, he had joint edema and arthritis.  (R. 198).  He was given a left ankle splint, and his Vioxx prescription was again renewed.  (R. 198).

On October 20, 2004, the records from ECHO show Plaintiff had swelling in his hands that was only in the left hand at that time; Plaintiff also reported swelling in his feet and legs, and the swelling apparently does travel.  (R. 196).

An office visit on November 3, 2004, showed edema and tenderness in the DIP, PIP, and AP and wrist joints with edema and tenderness in the ankles and knees.  (R. 194-95).  The assessment was multiple joint arthritis with a history of rheumatoid arthritis, and he was given a medrol dose pack.  (R. 195). The doctors noted that he had been having rheumatoid arthritis problems for eight or nine years but "kept on working until the pain became intolerable two and a half years ago to the point that he can't do previous work."  (R. 194).

Plaintiff was examined again on February 2, 2005.  (R. 192).  Plaintiff reported that he "has to be helped washing while in the shower."  The examination revealed edema and the assessment was multiple joint arthritis including degenerative spine disease and occasional radiculopathy.  It was opined that Plaintiff was limited in sitting, standing, walking, grasping, climbing, and crawling.  (R. 192).

On June 7, 2006, plaintiff presented to ECHO because his ankles and knees were "really bothering" him, and he was having trouble walking.  (R. 227-28).  An examination revealed no edema.  (R. 228).  The assessment was again arthritis.  (R. 227).

On September 18, 2006, Plaintiff returned to ECHO complaining of his knees and ankles hurting, and the arthritis was getting worse.  (R. 225).  He stated he would have one good day per month.  The pain was not all the time. The pain differed in severity depending on his activities.  His Celebrex helped to decrease inflammation.  (R. 225).

On February 17, 2007, Dr. Lagunzad completed a Physical Capacity Evaluation form. (R. 221). Dr. Lagunzad opined that in an eight-hour workday, Plaintiff could stand for zero hours and walk for zero hours; Plaintiff could, on a consistent basis, stand less than 20 minutes, walk less than ten minutes, and lift and carry less than ten pounds. (R. 221). Dr. Lagunzad further felt that, as a result of all of his patient's other medical problems, Plaintiff would miss three or more days per month from work, would need extra breaks, and would have difficulty staying focused on work-related tasks. (R. 221).

It has also been noted throughout Plaintiff's records at ECHO that he has COPD. (R. 192, 196-98). However, it has also been noted throughout that Plaintiff continues to smoke. On January 19, 2005, Plaintiff reported shortness of breath at night or when exerting himself. (R. 193).

### 2. State Agency Review

On June 22, 2000, state agency physician A. Landwehr, M.D., completed a Physical Residual Functional Capacity Assessment. (R. 162-69). Plaintiff could occasionally lift and carry 50 pounds, frequently carry 25 pounds, stand and walk about six hours in an eight-hour day, and sit about six hours in an eight-hour day. Plaintiff's ability to push or pull was unlimited. (R. 163). Handwritten notes indicate that Plaintiff's RFC was based on medical evidence that revealed that Plaintiff had normal gait and station, intact senses, and full strength. The x-rays revealed minor degenerative changes at T10-11 and T11-12

and also mild degenerative change in the bilateral hips.  (R. 163).  Plaintiff had

no postural limitations, manipulative limitations, or environmental limitations.

(R. 164-66).

## III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial

evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant

evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v.*

*Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes

that it is the Commissioner's duty to weigh the evidence, resolve material

conflicts, make independent findings of fact, and decide questions of credibility.

*Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate

the facts, weigh the evidence anew, or substitute its judgment for that of the

Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus,

even if reasonable minds could disagree about whether or not an individual was

"disabled," the court must still affirm the ALJ's decision denying benefits.

*Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must

establish that he suffers from a "disability" as defined by the Act.  "Disability" is

defined as the "inability to engage in any substantial gainful activity by reason of

a medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous

period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social

Security regulations set out a sequential five-step test the ALJ is to perform in

order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520.

The ALJ must consider whether the claimant:  (1) is presently employed; (2) has

a severe impairment or combination of impairments; (3) has an impairment that

meets or equals an impairment listed in the regulations as being so severe as to

preclude substantial gainful activity; (4) is unable to perform his past relevant

work; and (5) is unable to perform any other work existing in significant

numbers in the national economy.  *Id.*  The burden of proof is on Plaintiff during

steps one through four, and only after Plaintiff has reached step five does the

burden shift to the Commissioner.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir.

2000).

### V.  The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful

activity since the amended alleged onset date of February 2, 2005, and that

Plaintiff was only insured for DIB through June 30, 2007.  (R. 12).  The ALJ

continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had

four impairments that are classified as severe:  degenerative disc disease of the

thoracic spine; arthritis; diabetes mellitus; and bilateral hearing loss.  (R. 12).

The ALJ concluded that none of these impairments met or substantially equaled

any of the Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 13).  The

ALJ then found that Plaintiff retained the following residual functional capacity:

medium work with the exception that Plaintiff could only frequently stoop, kneel,

crouch, crawl, or climb stairs.  (R. 13).  Furthermore, the ALJ determined that

Plaintiff's complaints were not fully credible.  (R. 14).  The ALJ determined that,

based on his residual functional capacity, Plaintiff could perform his past work

as a car detailer and janitor.  (R. 16).  The ALJ, therefore, concluded that Plaintiff

was not under a disability.  (R. 16).

## VI.  Issues

Plaintiff has raised two issue.  The issues are as follows:

1.  Whether the ALJ improperly failed to give controlling weight to the

opinions of Plaintiff's treating physician.

2.  Whether the ALJ's credibility determination is patently wrong.

**Issue 1:     Whether the ALJ improperly failed to give controlling weight to
               the opinions of Plaintiff's treating physician.**

Plaintiff finds fault in the ALJ's treatment of the opinions of Plaintiff's

treating physician.  Opinions of a treating physician are generally entitled to

controlling weight.  *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).

However, an ALJ may reject the opinion of a treating physician if it is based on a

claimant's exaggerated subjective allegations, is internally inconsistent, or is

inconsistent with other medical evidence in the record.  *Dixon v. Massanari,* 270

F.3d 1171, 1177-78 (7th Cir. 2001).  Additionally, 20 C.F.R. § 404.1527 provides

guidance for how the opinions of treating and nontreating sources are to be

evaluated and explains as follows:

> (d)  *How we weigh medical opinions.*  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

> (1)  *Examining relationship.*  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

> (2)  *Treatment relationship.*  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (i)  *Length of the treatment relationship and the frequency of examination.*  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the

source's opinion more weight than we would give it if it were from a nontreating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) *Supportability.*  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.*  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.*  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors.*  When we consider how much weight to give to a medical opinion, we will also consider any factors

you or others bring to our attention, or of which we are
aware, which tend to support or contradict the opinion.  For
example, the amount of understanding of our disability
programs and their evidentiary requirements that an
acceptable medical source has, regardless of the source of
that understanding, and the extent to which an acceptable
medical source is familiar with the other information in your
case record are relevant factors that we will consider in
deciding the weight to give to a medical opinion.

*****

(f)  *Opinions of nonexamining sources.*  We consider all
evidence from nonexamining sources to be opinion evidence.  When
we consider the opinions of nonexamining sources, we apply the
rules in paragraphs (a) through (e) of this section.  In addition, the
following rules apply to State agency medical and psychological
consultants, other program physicians and psychologists, and
medical experts we consult in connection with administrative law
judge hearings and Appeals Council review:

(1)  In claims adjudicated by the State agency, a State
agency medical or psychological consultant (or a medical or
psychological expert (as defined in § 405.5 of this chapter) in
claims adjudicated under the procedures in part 405 of this
chapter) will consider the evidence in your case record and
make findings of fact about the medical issues, including, but
not limited to, the existence and severity of your
impairment(s), the existence and severity of your symptoms,
whether your impairment(s) meets or equals the requirements
for any impairment listed in appendix 1 to this subpart, and
your residual functional capacity.  These administrative
findings of fact are based on the evidence in your case record
but are not themselves evidence at these steps.

20 C.F.R. § 404.1527.

Plaintiff's treating physician was Dr. Lagunzad.  He opined that Plaintiff

could stand and walk for zero hours in an eight-hour workday; could

consistently stand less than 20 minutes, walk less than ten minutes, and lift

-12-

and carry less than ten pounds; and would need extra breaks and miss three or more days per month from work.  (R. 221).  This opinion, especially the assertion that Plaintiff could not stand or walk at all in an eight-hour workday has no support in the record.  Plaintiff's objective medical results consistently reveal conservative treatment and mild symptoms.  The opinions of Dr. Lagunzad are also not consistent with the findings of Dr. Edgerton or the state agency reviewing physicians.

Plaintiff raises another connected issue by arguing that the ALJ should have assumed that, since Plaintiff's x-rays were from 1988, the x-rays were so old that the ALJ should have ordered new testing.  However, it is the Plaintiff's affirmative obligation to produce objective medical evidence to support a claim for disability benefits.  *Eichstadt v. Astrue,* 534 F.3d 663, 668 (7th Cir. 2008), *Scheck v. Barnhart,* 357 F.3d 697, 702 (7th Cir. 2004).  Additionally, Plaintiff has only applied for DIB and his insured status ended almost two years ago in June 2007.  Even if the court were able to remand this case and order the Social Security Administration to send Plaintiff for x-rays, MRIs, or other objective medical testing, Plaintiff has failed to demonstrate that such testing would have any bearing on his condition prior to June 2007 when his insured status expired.

**Issue 2:     Whether the ALJ's credibility determination is patently wrong.**

Plaintiff also argues that the ALJ conducted an improper determination of Plaintiff's credibility.  An ALJ's credibility determination will not be overturned

unless it is "patently wrong."  *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000).

However, here the ALJ's "credibility" decision is not only an analysis of Plaintiff's

credibility, but also an evaluation of Plaintiff's complaints of pain.  Therefore, the

ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner

to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in

when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying
> medically determinable physical or mental impairment(s)--i.e., an
> impairment(s) that can be shown by medically acceptable clinical
> and laboratory diagnostic techniques--that could reasonably be
> expected to produce the individual's pain or other symptoms.  The
> finding that an individual's impairment(s) could reasonably be
> expected to produce the individual's pain or other symptoms does
> not involve a determination as to the intensity, persistence, or
> functionally limiting effects of the individual's symptoms.  If there is
> no medically determinable physical or mental impairment(s), or if
> there is a medically determinable physical or mental impairment(s)
> but the impairment(s) could not reasonably be expected to produce
> the individual's pain or other symptoms, the symptoms cannot be
> found to affect the individual's ability to do basic work activities.
>
> Second, once an underlying physical or mental impairment(s) that
> could reasonably be expected to produce the individual's pain or
> other symptoms has been shown, the adjudicator must evaluate the
> intensity, persistence, and limiting effects of the individual's
> symptoms to determine the extent to which the symptoms limit the
> individual's ability to do basic work activities.  For this purpose,
> whenever the individual's statements about the intensity,
> persistence, or functionally limiting effects of pain or other
> symptoms are not substantiated by objective medical evidence, *the*
> *adjudicator must make a finding on the credibility of the individual's*
> *statements based on a consideration of the entire case record.  This*
> *includes the medical signs and laboratory findings, the individual's*
> *own statements about the symptoms, any statements and other*
> *information provided by treating or examining physicians or*

> *psychologists and other persons about the symptoms and how they*
> *affect the individual, and any other relevant evidence in the case*
> *record.* This requirement for a finding on the credibility of the
> individual's statements about symptoms and their effects is reflected
> in 20 CFR 404.1529(c)(4) and 416.929(c)(4).  These provisions of the
> regulations provide that an individual's symptoms, including pain,
> will be determined to diminish the individual's capacity for basic
> work activities to the extent that the individual's alleged functional
> limitations and restrictions due to symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other
> evidence in the case record.

Social Security Ruling 96-7p (emphasis added).  SSR 96-7p further provides that

the ALJ's decision regarding the claimant's credibility "must contain specific

reasons for the finding on credibility, supported by the evidence in the case

record, and must be sufficiently specific to make clear to the individual and to

any subsequent reviewers the weight the adjudicator gave to the individual's

statements and the reasons for that weight."  *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's

subjective individual symptoms, such as pain, are considered, several factors are

relevant, including:  (1) the individual's daily activities; (2) the location, duration,

frequency, and intensity of the individual's pain or other symptoms; (3) factors

that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness,

and side effects of any medication the individual takes or has taken to alleviate

pain or other symptoms; (5) treatment, other than medication, the individual

receives or has received for relief of pain or other symptoms; (6) any measures

other than treatment the individual uses or has used to relieve pain or other

symptoms; and (7) any other factors concerning the individual's functional

limitations and restrictions due to pain or other symptoms.  20 C.F.R. §

404.1529(c)(3)(i)-(vii).

> In this case, the ALJ's credibility determination was as follows:

> The claimant testified that he has rheumatoid arthritis, and has pain in his hands, wrists, elbows, knees, and ankles.  He stated he can stand 10-15 minutes at a time, and lift a gallon of milk, although it sometimes slips through his hands.  He stated he has hearing loss, but does not wear hearing aids.  He stated he has breathing problems, and uses an inhaler off and on all day and night.  He stated he spends much of the day lying in bed and watching television.  He stated he has not shopped for the past three to four months, as his children or girlfriend do the shopping.  He stated he rarely leaves home, especially in winter.  He stated his girlfriend does everything for him, and helps him shower.  He stated he wears a brace on his right ankle due to swelling, and typically uses a walker or cane, although he was using two crutches at the hearing.  He stated he began using a cane one and a half years prior to the hearing.

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of theses symptoms are not entirely credible.

> There is little objective medical evidence to support the claimant's allegations.  The evidence shows the claimant has complained of joint pain since at least 1988.  However, there are few objective findings other than an x-ray dated February 22, 1988 showing mild degenerative changes at T10-11 and T11-12, and mild degenerative changes of both hips (Ex. 2F, 3F).  An audiological examination dated June 14, 2000 showed mild hearing loss bilaterally, without the use of hearing aids.  The claimant had 100% speech recognition at 65 dB (Ex. 5F).

> All of the claimant's treatment during the period in question has been through ECHO Community Health, a low cost clinic, where he has been treated by Edward Lagunzad, D.O.  The claimant was first seen on April 23, 2003 with complaints of arthritis and pain in his feet, knees, and hands.  He had some generalized decreased breath

sounds.  Dr. Lagunzad noted the claimant had a history of
rheumatoid arthritis.  He noted the claimant had hypertension.  On
October 29, 2003, he noted the claimant's arthritis was better with
Vioxx.  On September 28, 2004 Dr. Lagunzad noted the claimant's
ankle was swollen, and he was wearing a brace on the right ankle.
Dr. Lagunzad stated the claimant had "traveling arthritis."  On
October 20, 2004, Dr. Lagunzad noted the claimant had edema of
the MP joints.  On November 3, 2004 Dr. Lagunzad stated the
claimant was in moderate distress due to pain.  He stated the
claimant had tenderness and edema in the DIP, PIP, MP, and wrist
joints.  He noted the claimant had tenderness and edema in the
knee and ankles.  He noted decreased truncal range of motion due
to pain.  On January 19, 2005 the claimant had a BMI of 33.  The
claimant continued to have edema of all finger joints on February 2,
2005.  However, lab testing was negative, with a negative RA factor,
ANA, and sed rate.  On July 6, 2005, Dr. Lagunzad indicated the
claimant had osteoarthritis and possible seronegative rheumatoid
arthritis (Ex. 7F).

On March 22, 2006, the claimant admitted to taking his blood
pressure medication occasionally.  This is not the only notation that
the claimant was not compliant with medication.  On June 7, 2006,
the claimant reported problems walking.  However, Dr. Lagunzad
stated there was no edema of the joints or muscle atrophy.  On
September 18, 2006, the claimant told Dr. Lagunzad his pain was
not constant, and reported that Celebrex helped.  On December 14,
2006 the claimant's gait was normal.  He did not have any edema or
joint swelling.  On February 19, 2007, the claimant complained of
swelling in his left elbow, and knee, back and shoulder pain.  He
told Dr. Lagunzad he used a rolling chair to get around at home.
Dr. Lagunzad noted swelling of the left posterior elbow, wrist, hand,
and ankle.  He stated the claimant had multiple sites of
musculoskeletal pain, and that the claimant could no longer do
manual labor.  Blood tests performed February 20 were normal
other than an elevated uric acid level, consistent with gout (Ex. 8F).

The claimant does not have significantly limited daily activities.  His
testimony regarding his pain levels is not consistent with the
objective evidence.  Although the claimant alleges severe hearing
loss, he does not wear hearing aids, and was able to understand the
hearing proceedings.  The claimant has had very limited medical
treatment.  He does not take potent pain medications and has stated
in the past that Celebrex, an anti-inflammatory medication, has

> been of help.  He has no side effects from medication.  The physical
> signs on examination do not support his allegation that he needs to
> use a cane or walker.  The claimant reports no other methods of
> relieving pain other than lying in bed.

(R. 14-15).  This was a very thorough analysis of Plaintiff's credibility that

actually took into consideration all of the factors listed in 20 C.F.R. § 404.1529.

The court finds particularly convincing Plaintiff's fairly conservative treatment

that did not involve any physical therapy, epidural injections, surgery, and did

not require the use of narcotic pain medication.  Also, of importance was

Plaintiff's non-compliance which, as the ALJ mentioned, included Plaintiff's

failure to take blood pressure medication, but also included Plaintiff's repeated

failure to cease cigarette smoking.  In addition, the court notes that Plaintiff

routinely had no objective medical evidence to support his complaints;

specifically there were no reports of significant loss of range of motion or loss of

strength in Plaintiff's extremities, no problems with gait or station, and there

were no blood tests that supported claims of rheumatoid arthritis.  Plaintiff has

especially provided no objective medical evidence to support his claims that he

needs to use a walker or that his pain is so debilitating that he spends his entire

life in bed.  Because the ALJ's credibility determination took into account all

relevant factors and because Plaintiff's testimony is unsupported by objective

medical testing, the ALJ's credibility assessment was clearly not "patently

wrong."

## VII.  Conclusion

The ALJ was not obligated to grant controlling weight to the opinions of

Plaintiff's treating physician, Dr. Lagunzad.  Additionally, the ALJ's assessment

of Plaintiff's credibility was not patently wrong.  Therefore, the court can trace

the path of the ALJ's reasoning, and the decision is supported by substantial

evidence.  The final decision of the Commissioner is **AFFIRMED**.

**SO ORDERED** this 1st day of June, 2009.

_____

WILLIAM G. HUSSMANN, JR.
Magistrate Judge

**Electronic copies to:**

J. Michael Woods
WOODS & WOODS
mwoods@woodslawyers.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov